IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION


HERBERT LEE WOOD,                    :

      Plaintiff,                     :

vs.                                  :      CIVIL ACTION 05-0578-CG-M

PRISON HEALTH SERVICES, INC          :
      et al,
                                     :

      Defendants.                    :


REPORT AND RECOMMENDATION

      Plaintiff, an Alabama prison inmate proceeding pro se and in
forma pauperis filed a Complaint under 42 U.S.C. § 1983.  This
action was referred to the undersigned pursuant to 28 U.S.C. §
636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the
undersigned on the Motion for Summary Judgment of Defendants,
Prison Health Services ("PHS"), Dr. Robert Barnes, and Nurse
Julia Gordon (Docs. 26, 28, 35 and 37); Plaintiff's Response to
Special Report (Doc. 32); Plaintiff's Response to Defendants'
Supplemental Special Report (Doc. 36); and Plaintiff's Affidavit
in Opposition to Motion for Summary Judgment (Doc. 40).  For the
reasons stated below, it is recommended that the Motion for
Summary Judgment of Defendants Prison Health Services, Dr. Robert
Barnes, and Nurse Julia Gordon be granted and that Plaintiff's
action against Defendants be dismissed with prejudice.

1

I.   SUMMARY OF FACTUAL ALLEGATIONS

From its review of the record, the Court summarizes the parties' allegations that are material to the issues addressed in this Report and Recommendation.  Plaintiff, an Alabama inmate, is incarcerated at Fountain Correctional Facility ("Fountain"), and complains that since December of 2004, while incarcerated at Fountain, he has been denied appropriate medical treatment for his serious heart problems.[1]  (Doc. 4 at 4-7).

According to Plaintiff, on November 18, 2004, he underwent a heart procedure (described in more detail later), and that two days later, on November 20, 2004, was released from Baptist South Medical Center.  (Doc. 32 at 2).  According to Plaintiff's "discharge" paperwork, he was prescribed both Plavix 75 mg to be taken daily, and enteric coated aspirin, 325 mg once daily, among other medications, by his heart surgeon, Dr. Pervaiz Malik.  (Id.).  Plaintiff claims that these medications were prescribed for him to be taken "lifelong."  (Id.).

Upon his hospital release, Plaintiff was taken to Kilby Correctional Facility before being transferred back to Ventress Correctional Facility.  (Id.).  Upon his transfer to Ventress Correctional Facility, Plaintiff also received an approval from PHS for a follow-up appointment with Dr. Malik, which had been

_____

[1]Plaintiff is serving a life sentence for his murder and robbery convictions.  (Doc. 4 at 6).

recommended by Dr. Malik to occur six weeks following Plaintiff's procedure on November 18, 2004.  (Id.).  The approval for the appointment was effective for a time period of sixty days. Additionally, after Plaintiff had returned to Ventress Correctional Facility, a non-formulary pharmacy request form was submitted on November 30, 2004, for the medication Plavix, which Dr. Malik had prescribed.  The approval was given for a 30 day supply, and Plaintiff received this medication on December 3, 2004.  (Id. at 3).

On December 6, 2004, Plaintiff was transferred to Fountain Correctional Facility ("Fountain"), and he then informed the medical staff about his condition and his prescription for Plavix, as well as his requested follow-up appointment with Dr. Malik.  (Id.).  Defendant Gordon submitted a request for a refill of Plaintiff's Plavix on December 10, 2004.  Again, a thirty day supply was approved for Plaintiff.  (Id.).  Plaintiff claims that he next received his Plavix refill on February 7, 2005. Plaintiff further asserts that he "was told repeatedly by Dr. Barnes and Nurse Practitioner Gordon that Plavix was only approved for 30 days after stent implantation, per PHS policy." (Id.).

Plaintiff claims that on "numerous occasions" he had to go to the HCU complaining of chest pains while he was not taking Plavix.  Plaintiff contends that he would have to take 1 to 2

3

nitroglycerin tablets every other day.  (Id.).  Plaintiff claims
that requests for approval of Plavix were only made three times,
at the time of filing his Response to Defendants' Special Report.
(Doc. 32 at 3).  Plaintiff filed his Response on August 2, 2006.
According to Plaintiff, Defendant Gordon submitted requests on
December 10, 2004, and on June 29, 2005.  (Id.).  Plaintiff
further states that Dr. Barnes submitted a request on October 19,
2005, and when it was not approved, Plaintiff's Plavix was
discontinued.  (Id.).

Plaintiff also complains that there was a delay in the
scheduling of his follow-up appointment with a cardiologist.  He
maintains that although his follow-up appointment had been
approved by PHS while he was housed at Ventress, after his
arrival at Fountain, the medical staff advised him that they had
to seek approval for his follow-up appointment.  (Id. at 4).
Plaintiff claims that he informed the staff on January 4, 2005,
that he had already received approval on November 22, 2004, which
was good for sixty days from that date.  Again, on April 20,
2005, Plaintiff claims that he notified the medical staff that he
needed to receive approval for a follow-up visit with his
cardiologist.  Despite Plaintiff's requests and complaints, he
alleges that he was not taken to a cardiologist until October 21,
2005.  (Id.).  However, Plaintiff does note that Dr. Barnes did
request a cardiology follow-up appointment for him on June 10,

4

2005.  (<u>Id.</u>).

Plaintiff was examined by Dr. David Trice, a cardiologist, in Fairhope, Alabama, on October 21, 2005.  (<u>Id.</u>).  In addition to an examination, Plaintiff was afforded an EKG, which Dr. Trice found to be abnormal.  Dr. Trice then recommended a heart catherization.  (<u>Id.</u>).  Plaintiff claims that he was next examined by Dr. Michael Pursley who recommended a stress test, which was ultimately performed on November 23, 2005.  (<u>Id.</u>).  The test had to be halted after six minutes due to Plaintiff's fatigue and tightness in his chest.  Following the test, delayed images were taken which, according to Plaintiff, indicated "6xt/cardiolite positive for reversible ischemia with a small area of apical reversibility in borderline ECG changes."  (<u>Id.</u> at 4-5).  Dr. Pursley requested a follow-up examination to discuss the results of the test.

Plaintiff acknowledges that he had a follow-up examination with Dr. Pursley on January 11, 2006, and states that Dr. Pursley advised him that Plaintiff could have a heart catherization or Dr. Pursley could raise Plaintiff's dosage of Tenormin.  (<u>Id.</u> at 5).  Plaintiff admittedly chose to have his medication adjusted, in lieu of the heart catherization.

Plaintiff complains that during this time period, he was not being given Plavix, and additionally, that Nurse Gordon had reduced his aspirin dosage to 81 mg, instead of the 325 mg that

he had been receiving. (<u>Id.</u>). However, according to Plaintiff, Dr. Barnes restarted his 325 mg of aspirin, and on March 9, 2006, prescribed Coumidin, another blood thinner, instead of Plavix. (<u>Id.</u>). Plaintiff claims that during the time period of January 11, 2006, until August of 2006, his "pain has been unrelenting." (<u>Id.</u>). Plaintiff also complains that when he has to take numerous nitroglycerin tablets because of chest pain, he then suffers headaches and feels dizzy. (<u>Id.</u>).

Plaintiff contends that it is the policy of PHS to only approve a prescription for Plavix for 30 days following stent implantation. (<u>Id.</u> at 6). Plaintiff also claims that he was told by a new nurse practitioner at Fountain that his heart catherization would be put off as long as possible to avoid the cost. Plaintiff further claims that some of his medical records have been falsified. (<u>Id.</u>).

Defendants PHS, Dr. Barnes, and Nurse Gordon filed their Answer and Special Report, acknowledging Plaintiff's claims, but asserting that they have always provided Plaintiff with appropriate medical care. (Docs. 26 and 27). Dr. Barnes explains that upon Plaintiff's arrival at Fountain, on December 6, 2004, Defendant Barnes reviewed Plaintiff's medical records, and determined that he had a history that was significant for advanced ischemic heart disease. (Doc. 26, Exs. A and B). Specifically, Defendant Barnes determined that Plaintiff had

6

undergone coronary bypass grafting in May of 2001, whereby three (3) vessels were bypassed. (Doc. 26 at 2). Plaintiff later received a stent in July of 2001, as well as two balloon angioplasties in October of that year. (Id.).

According to Defendants, on November 18, 2004[2], Dr. Pervaiz Malik performed a left heart catheterization, selective coronary angiography, left ventriculography, stent implantation of the protected left main coronary artery and multi-stent implantation of severe disease right coronary artery. (Doc. 35 at 2). According to his records, Plaintiff tolerated these procedures successfully. (Doc. 26 at 3). Following his procedure, Plaintiff was strongly advised to cease smoking and to maintain a low sodium/low cholesterol diet. (Id.). According to Defendants, Plaintiff has been "maintained" with numerous medication post-operatively, including Nitroglycerin, Coated Aspirin, Atenolol, Vasotec, Isordil and Crestor. (Id.). He was also prescribed Plavix as indicated for approximately twelve months following his heart catherization and stent procedure. (Id.).

Regarding Plaintiff's complaint about the medication Plavix,

---

[2]Plaintiff complains that Defendants were incorrect regarding the date of Plaintiff's surgery. Defendants, in their Supplemental Special Report, explained their error, acknowledging that Plaintiff's surgery occurred on November 18, 2004, instead of December 5, 2004. Defendants explained that the records do indeed show that Plaintiff's surgery was on November 18, 2004, but that Plaintiff's procedure was described and reported as part of his prison medical record on December 5, 2004. (Doc. 35 at 2-3).

Defendants note that Plaintiff was first prescribed Plavix on November 20, 2004, subsequent to his November 2004, cardiac catheter procedure. (Doc. 35, Ex. B).  Plaintiff received sixty tablets to keep on his person on November 30, 2004, and an additional thirty tablets on December 3, 2004. (Id.).  On December 8, 2004, Plaintiff's Plavix prescription was again extended for ninety days, and then again extended on January 6, 2005, for another ninety days to keep on his person through April 6, 2005. (Id.).  According to Defendants, on May 11, 2005, Plaintiff's prescription was extended ninety days through August 16, 2005, and again on June 29, 2005 through September 29, 2005. The prescription was again renewed on October 19, 2005, for ninety days. (Id.).  Plaintiff's MAR reflects that Plaintiff continued to receive Plavix until January 2006, when it was discontinued. (Id.).  According to Defendants, Plaintiff was prescribed Plavix for approximately one year following his November 2004 procedure.  Defendants contend that this medication would have been available at pill call during those times when it was unavailable to keep on person ("KOP"). (Id.).

On November 8, 2005, Plaintiff was examined by Cardiologist Michael Pursley for a routine follow-up and specialty evaluation. (Doc. 26 at 3).  Dr. Pursley examined Plaintiff and noted that Plaintiff continued to smoke, despite Dr. Malik's recommendation. Before recommending a course of treatment, Dr. Pursley requested

8

that Plaintiff receive a stress test and further recommended that
Plaintiff be maintained on current medications.  (Id.).
Accordingly, Plaintiff was afforded a GXT thallium Myocardial
Perfusion Scan ("stress test") on November 23, 2005.  It was
determined that Plaintiff was borderline for ischemia with a
small area of apical reversibility noted.  (Id.).  On January 11,
2006, Plaintiff was again taken to see Dr. Pursley for a follow-
up examination.  Dr. Pursley noted specifically that Plaintiff's
angina was not severe, and that his symptoms were relieved with
Nitroglycerin.  (Id.).  It was further noted that Plaintiff
denied any symptoms of vomiting or nausea.  Dr. Pursley again
recommended that Plaintiff be maintained on current medications
as warranted by his changing condition.  (Id.).

   According to Defendants, Plaintiff's angina has been
maintained with numerous medications including Nitroglycerin,
Coated Aspirin, Atenolol, Vasotec, Isordil, Crestor, Coumadin,
Mevacor, and Tenormin.  (Id.).  Further, Plaintiff was prescribed
Plavix for a twelve month period following his November 2004
operation.  Plaintiff has additionally been prescribed Motrin for
intermittent pain and Zantac to ease stomach irritation caused by
his other medications.  Dr. Pursley has approved all of
Plaintiff's medications for treatment of his chronic cardiac
condition and these medications have been adjusted as warranted
by his changing condition.  (Id.).  Plaintiff complains that

Nurse Gordon reduced his amount of Aspirin while taking Plavix, but Nurse Gordon explains that she did this because Aspirin has potential negative side effects when administered with Plavix, and she wanted to decrease the chances of Plaintiff suffering from potential side effects, such as GI bleeding.  (Id.).

Defendants argue strongly that Plaintiff's medical conditions and complaints have been evaluated in a timely fashion.  They contend that his diagnosed conditions have been treated in a timely and appropriate fashion by the Medical Defendants and all other PHS employees involved in his care at Fountain.  Plaintiff has been seen and evaluated by the medical nursing staff, and has been referred to an appropriate care provider each time he has registered a complaint with Prison Health Services.  (Id.).

In addition to the many examinations, tests, and treatments that Plaintiff was afforded at free world facilities with free world doctors, during Plaintiff's incarceration at Fountain, he has been given the benefit of numerous medications as detailed above.  Additionally, Plaintiff has been afforded a number of specialty profiles, including a "no prolonged standing profile," "no heavy lifting profile," "bottom bunk profile," and a "lay-in as needed."  (Doc. 28, Ex. A-1 at 65).

## II.  PROCEDURAL ASPECTS OF THE CASE

On November 8, 2005, Plaintiff filed his Complaint under 42

10

U.S.C. § 1983, alleging that PHS, Dr. Robert Barnes, and Nurse Julia Gordon violated his Eighth Amendment rights by denying him appropriate medical treatment for his heart condition.[3] (Doc. 4). Plaintiff seeks monetary damages in the amount of $500,000 for Defendants' alleged deliberate indifference to his serious medical needs. (Doc. 4 at 9). Plaintiff also asks this Court to have him transferred to "Limestone Correctional" or to "Hamilton A&I" where, according to Plaintiff, he will receive better medical attention. (Id.). Plaintiff has additionally filed an Amended Complaint, reasserting his original claims. (Doc. 7).

On June 29, 2006, Defendants PHS, Barnes, and Gordon filed their Special Report and Answer, denying any violation of Plaintiff's constitutional rights and asserting, in part, the defenses of qualified, absolute, substantive, state agent and

---

[3]Plaintiff originally filed this action on October 7, 2005; however, Plaintiff was ordered by the Court to file his Complaint on this Court's new forms, along with either a Motion to Proceed Without Prepayment of Fees or the proper filing fee. (Docs. 1 and 2). On November 8, 2005, Plaintiff filed the Complaint which, by this Court's Order of October 12, 2005, supersedes the original. (Docs. 3 and 4).

Additionally, in Plaintiff's original and revised Complaints, he also named as Defendants Donal Campbell and Jerry Ferrell. Subsequently, Plaintiff dismissed Donal Campbell, as he could not find a proper address for the former commissioner. Plaintiff also dismissed Jerry Ferrell, noting that since the beginning of his litigation, Mr. Ferrell had been most helpful in Plaintiff's healthcare. (Doc. 31).

discretionary function immunity.[4]  (Docs. 26 and 27).  Defendants also assert that Plaintiff was contributorily negligent, that Plaintiff's damages, if any, resulted from an independent, efficient, and/or intervening cause, and that Plaintiff has failed to mitigate his damages, if any.  (Doc. 27).  Defendants also assert the Alabama Medical Liability Act, as well as the Prison Litigation Reform Act as affirmative defenses.  Defendants further contend that they are not responsible for the policies and procedures of the Alabama Department of Corrections.  (Id.).

On August 2, 2006, Plaintiff filed a Response to Defendants' Special Report (Doc. 32).  Subsequently, Defendants filed a Supplemental Special Report on October 19, 2006.  (Doc. 35).  Next, Plaintiff filed a Response to Defendants' Supplemental

---

[4]Although Defendants have asserted numerous types of immunity, as a private entities, PHS, Dr. Robert Barnes and Nurse Julia Gordon are not entitled to immunity, whether qualified or absolute.  See Swann v. Southern Health Partners, Inc., 388 F.3d 834, 837 (11th Cir. 2004) ("The parties agree that as a private entity, SHP [a private corporation employed by the county to provide medical care to inmates at the county jail] is not entitled to assert a qualified immunity defense."); Hinson v. Edmond, 205 F.3d 1264, 1265 (11th Cir. 2000) (a "privately employed prison physician [ ] is ineligible to advance the defense of qualified immunity"); Edwards v. Alabama Dep't of Corrections, 81 F. Supp. 2d 1242, 1254 (M.D. Ala. 2000) (a "private entity" contracting with a state to provide medical services to state inmates "is not entitled to qualified immunity....").  With respect to absolute immunity, Defendants have cited no case, and the Court is aware of no case, extending absolute immunity to privately employed medical corporations, physicians, or nurses providing medical services to state inmates.  However, immunity for the medical defendants is not an issue in this action, as the Court has determined that Plaintiff has failed to show a constitutional violation.

Special Report. (Doc. 36). The Court converted Defendants'
Answer and Special Report to a Motion for Summary Judgment on
April 13, 2007. (Doc. 37). Plaintiff then filed an Affidavit in
Opposition to Defendants' Motion for Summary Judgment. (Doc.
40). All of said pleadings are now before the Court.

<u>III. SUMMARY JUDGMENT STANDARD</u>

In analyzing the propriety of a motion for summary judgment,
the Court begins with these basic principles. The <u>Federal Rules
of Civil Procedure</u> grant this Court authority under Rule 56 to
render "judgment as a matter of law" to a party who moves for
summary judgment. "[S]ummary judgment is proper 'if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact. . . .'"
<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (quoting <u>Fed.
R. Civ. P.</u> 56(c)).

The Court must view the evidence produced by "the nonmoving
party, and all factual inferences arising from it, in the light
most favorable to" that party. <u>Barfield v. Brierton</u>, 883 F.2d
923, 934 (11th Cir. 1989). However, Rule 56(e) states that:

> an adverse party [to a motion for summary
> judgment] may not rest upon the mere
> allegations or denials of the adverse party's
> pleading, but the adverse party's response,
> by affidavits or as otherwise provided in
> this rule, must set forth specific facts
> showing that there is a genuine issue for
> trial. If the adverse party does not so

> respond, summary judgment, if appropriate,
> shall be entered against the adverse party.

Fed. R. Civ. P. 56(e); see also Celotex Corp., 477 U.S. at
325-27.  "[T]here is no issue for trial unless there is
sufficient evidence favoring the nonmoving party for a jury to
return a verdict for that party. . . .  If the evidence is merely
colorable, . . . or is not significantly probative, . . . summary
judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 249-50 (1986) (internal citations omitted).  "Summary
judgment may be granted against a party who fails to establish
the existence of an element essential to that party's case and on
which that party will bear the burden of proof at trial."
Liberty Mut. Fire Ins. Co. v. Sahawneh, 2001 WL 530424, *1 (S.D.
Ala. May 11, 2001) (citing Anderson, 477 U.S. at 249-50).

## IV. DISCUSSION

In this action, Plaintiff seeks redress for alleged
constitutional deprivations pursuant to 42 U.S.C. § 1983.
Specifically, Plaintiff alleges that the deliberate indifference
of Defendants PHS, Dr. Barnes, and Nurse Julia Gordon, to his
serious medical needs while incarcerated at Fountain Correctional
Facility, *i.e.*, the denial and delay of adequate medical
treatment for his heart condition, violated his rights under the
Eighth Amendment.  For the reasons set forth below, the Court
finds that Plaintiff's allegations fail to establish any
constitutional violation by Defendants.  Thus, it is recommended

14

that Defendants' Motion for Summary Judgment be granted.

<u>Claims Against Prison Health Services, Inc.</u>

Plaintiff claims that his Eighth Amendment right to be free from cruel and unusual punishment has been violated as a result of inadequate medical treatment by Defendant Prison Health Services, Incorporated.  However, in order to bring a viable § 1983 claim, the defendant sued must be an entity that is subject to being sued.  <u>Dean v. Barber</u>, 951 F.2d 1210, 1214 (11th Cir. 1992).

The capacity of a party to be sued is "determined by the law of the state in which the district court is held. . . ."  Fed. R. Civ. P. 17(b); <u>see</u> <u>Dean</u>, 951 F.2d at 1214.  For example, under Alabama law, an Alabama sheriff's department lacks the capacity to be sued.  <u>Id.</u> at 1214-15; <u>King v. Colbert</u>, 620 So.2d 623, 626 (Ala. 1993); <u>White v. Birchfield</u>, 582 So.2d 1085, 1087 (Ala. 1991).  However, a sheriff may be sued.  Similarly, Prison Health Services, Inc., is not a distinct legal entity that is subject to suit, nor is it a "person" for § 1983 purposes.  <u>See</u> <u>Harris v. Fairman</u>, No. 94 C 3883, 1995 WL 151806, at * 6 (N.D. Ill. Mar. 31, 1995) (jail medical staff); <u>Jefferys v. Department of Corrections</u>, No. 94 CIV 2942 (VLB), 1994 WL 702752 (S.D.N.Y. Dec. 13, 1994) (jail medical staff); <u>Johnson v. Sheahan</u>, 94 C 618, 1994 WL 494803 (N.D. Ill. Sept. 8, 1994) (jail medical staff); <u>Merrell v. Dukes</u>, No. 85-2556, 1985 WL 3566, at *1 (E.D. Pa. Nov.

15

5, 1985) (prison medical staff); accord Bey v. Pennsylvania Department of Corrections, 98 F. Supp. 2d 650, 657 & n.21 (E.D. Pa. 2000)(dismissing medical staff because it was a component of a state institution entitled to Eleventh Amendment immunity and, therefore, was not capable of being sued, and was not a "person" for § 1983 purposes).

PHS, as a private corporation, is liable under § 1983 only when an official policy or custom of the corporation causes the alleged constitutional deprivation. Demm v. Charlotte County Jail Administration & Staff, No. 2:04-cv-634-FtM-99SPC, 2007 WL 57772, at *6 (M.D. Fla. Jan. 5, 2007), citing Monell v. Dep't of Soc. Serv., 436 U.S. 658, 691 (1978). Although Plaintiff has alleged that his Plavix was discontinued because of PHS policy, Plaintiff has offered nothing but his own opinion that there is such a "policy." Because Prison Health Services, Inc., is not a distinct legal entity subject to suit for § 1983 purposes, Plaintiff fails to state a claim upon which relief could be granted as to this Defendant.[5] Therefore, the Court is granting the Motion for Summary Judgment filed on behalf of Prison Health Services, Inc.

Claims Against Dr. Robert Barnes and Julia Gordon

_____

[5]Even if the Court were to assume that there was such a policy as Plaintiff alleges, Plaintiff has failed to show a constitutional violation as a result of his medical care in this action.

As discussed above, in this action, Plaintiff alleges that Defendants were "deliberately indifferent" to his serious medical needs in violation of the Eighth Amendment by failing to provide proper medical treatment for him during his incarceration at Fountain Correctional Facility.  Specifically, Plaintiff alleges that he has been denied necessary medication and that he was delayed a follow-up appointment with his cardiologist.  (Docs. 4, 7, 32 and 36).  Plaintiff states that because of the denial at times of the medication Plavix, and the delay of his follow-up appointment with a cardiologist, he has suffered chest pains. (Id.).

The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  "The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs."  Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  In Sims v. Mashburn, 25 F.3d 980 (11th Cir. 1994), the Eleventh Circuit delineated the objective and subjective portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two
> components, an objective component, which
> inquires whether the alleged wrongdoing was
> objectively harmful enough to establish a

> constitutional violation, and a subjective
> component, which inquires whether the
> officials acted with a sufficiently culpable
> state of mind.

<u>Sims</u>, 25 F.3d at 983 (citing <u>Hudson v. McMillian</u>, 503 U.S. 1, 8 (1992)).

To meet the objective element required to demonstrate a denial of medical care in violation of the Eighth Amendment, a plaintiff first must demonstrate the existence of an "objectively serious medical need." <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003). A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" <u>Id.</u> (quoting <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1187 (11th Cir. 1994)). "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." <u>Id.</u> (internal quotation marks and citation omitted).

In order to meet the required subjective element of an Eighth Amendment denial of medical care claim, a plaintiff must demonstrate "deliberate indifference" to a serious medical need. <u>Id.</u>

> In <u>Estelle</u>, the Supreme Court established
> that "deliberate indifference" entails more
> than mere negligence. <u>Estelle</u>, 429 U.S. at
> 106, 97 S. Ct. 285; <u>Farmer</u>, 511 U.S. at 835,
> 114 S. Ct. 1970. The Supreme Court clarified

18

the "deliberate indifference" standard in
Farmer by holding that a prison official
cannot be found deliberately indifferent
under the Eighth Amendment "unless the
official *knows of* and *disregards an excessive
risk to inmate health or safety*; the official
must both be aware of facts from which the
inference could be drawn that a substantial
risk of serious harm exists, and he must also
draw the inference." Farmer, 511 U.S. at
837, 114 S. Ct. 1970 (emphasis added).  In
interpreting Farmer and Estelle, this Court
explained in McElligott that "deliberate
indifference has three components: (1)
subjective knowledge of a risk of serious
harm; (2) disregard of that risk; (3) by
conduct that is more than mere negligence."
McElligott, 182 F.3d at 1255; Taylor, 221
F.3d at 1258 (stating that defendant must
have subjective awareness of an "objectively
serious need" and that his response must
constitute "an objectively insufficient
response to that need").

Farrow, 320 F.3d at 1245-46.

     For purposes of this analysis, the Court will assume that
Plaintiff has demonstrated an "objectively serious medical need"
in order to satisfy the first component of his Eighth Amendment
claim.  The Court turns its focus, instead, to Plaintiff's claim
that Dr. Barnes and Nurse Gordon were deliberately indifferent to
his serious medical need for treatment for his heart condition.

     Plaintiff maintains that he has suffered a heart condition
with chest pains for which he required medical care.  (Doc. 4).
Plaintiff's medical records do indeed reflect that he suffered
chest pains, as well as heart problems, but they also reflect
extensive, ongoing medical treatment, including tests, specialist

examinations, and medications prescribed for this heart condition. (Docs. 26, 28 and 35). As noted in detail above, the tests, specialist examinations, and medications have maintained Plaintiff's condition, as well as provided Plaintiff relief from chest pain. (<u>Id.</u>). Plaintiff has also received special treatment by Defendants, such as a "bottom bunk profile," "no heavy lifting," and "no prolonged standing profile." (<u>Id.</u>)

The Court notes that Plaintiff's complaint with regard to the medication Plavix is that at times this particular medication was delayed, and that eventually it was discontinued. (Doc. 4). Plaintiff's insistence that Plavix should have never been discontinued appears to be based upon a discharge order following his heart procedures performed by Dr. Malik in 2004, which lists the medication Plavix, along with the word "(lifelong)" noted beside the medication. (Doc. 32 at 2). Plaintiff has provided the Court nothing more than his own opinion, along with this discharge paper, that would indicate to this Court that the specific prescription "Plavix" must be used by Plaintiff for the remainder of his life. Dr. Malik has not treated Plaintiff since 2004, and it is reasonable that another doctor, such as Dr. Barnes, or another cardiologist might disagree with the use of this particular medication, and/or treat a patient with a different brand of medication.

Defendants have provided documentation from Plaintiff's

medical file which reflects that Plaintiff received Plavix
through January 2006, which was slightly more than one year past
Plaintiff's November 2004 procedure.  (Doc. 35, Ex. B).
Moreover, Defendants have argued that they treated Plaintiff's
"changing" condition with medications, examinations, and tests as
they deemed appropriate.  (Doc. 28, Ex. B at 3).  Plaintiff's
medical records also reflect numerous medications which have been
administered to Plaintiff to improve his health or daily comfort.
(Doc. 35, Ex. B).  Additionally, the Court finds it significant
that when Plaintiff was examined by Dr. Pursley on January 11,
2006, Dr. Pursley noted specifically that Plaintiff's angina, or
chest pain, was not severe, and that his symptoms were relieved
with Nitroglycerin.  (Doc. 28, Ex. B at 3).  It was further noted
that Plaintiff denied any symptoms of vomiting or nausea.  Dr.
Pursley again recommended that Plaintiff be maintained on current
medications as warranted by his changing condition.  (Id.).
Plaintiff's own medical records reflect that he was treated quite
extensively for his condition, and by all accounts, treated
effectively.

     Regarding Plaintiff's complaint of delay in receiving a
follow-up appointment with a cardiologist, the records reveal
that while Dr. Malik had recommended a follow-up appointment to
occur approximately around the first of 2005, Plaintiff's next

examination with a cardiologist was on October 21, 2005.[6]  (Doc.
28, Ex. A-4 at 26-30).  However, the Court notes that in between
the time of the original procedure and the time of the follow-up
procedure, Plaintiff was transferred from Kilby Correctional
Facility to Ventress Correctional Facility, and then last, to
Fountain.  It appears that since Plaintiff was no longer located
in the vicinity of Dr. Malik's practice, he was, subsequently,
seen by a cardiologist in Fairhope.  Plaintiff was transferred to
Fountain at the end of 2004, and a thorough review of Plaintiff's
records reveals that he received quite extensive medical care
while at Fountain.  By Plaintiff's own admission, Dr. Barnes did
request an appointment for Plaintiff with a cardiologist on June
10, 2005. (Doc. 32 at 3).  A review of the records reveals that
this request was actually granted, which resulted in the October
2005 appointment with Dr. Trice.  It is certainly not clear by
the records exactly which factor(s) may have caused a delay in
time, *i.e.*, the free world specialist's schedule, transportation
through the prison, PHS documentation and scheduling, or inaction
by Dr. Barnes.

While the Court notes that there was some delay in getting
Plaintiff's follow-up appointment scheduled, this time period
certainly does not evidence deliberate indifference on the part

_____

[6]Plaintiff was initially seen by Dr. Trice, a cardiologist
in Fairhope.  Following this visit, Plaintiff was then seen by
Dr. Pursley, a different cardiologist.

of Dr. Barnes or Nurse Gordon, particularly when one reviews the extensive medical care and medications which Plaintiff was receiving during the interim time.[7]  Plaintiff's medical records reflect extensive care by Dr. Barnes, many examinations by the medical staff, and many carefully administered medications. Delays in scheduling free world specialist appointments may occur as a result of a number of reasons, particularly in the prison system where numerous factors must be considered and coordinated, as well as accommodating the usually busy schedule of the free world doctors.  The evidence does not reveal any deliberate indifference on the part of Dr. Barnes or Nurse Gordon.  In fact, to the contrary, the facts reveal that Plaintiff received, and is continuing to receive, extensive quality treatment for his heart condition.[8]  (Docs. 26, 27 and 35).

Furthermore, even if this Court were to determine that the delay in scheduling Plaintiff's cardiologist appointment was deliberate, Plaintiff has offered no evidence of any substantial harm, such as extreme pain or permanent impairments as a result of the delay.  To the contrary, when Plaintiff was examined by

---

[7]Plaintiff has made no claim that he has been permanently impaired or injured as a result of any delay in seeing a cardiologist.  In fact, after his examination, the cardiologist recommended that he be maintained on his current medications. (Doc. 28, Ex. B at 3).

[8]The Court also takes note of the fact that Plaintiff has continued to smoke cigarettes, despite doctor's strong recommendation against it.

23

Dr. Pursley on January 11, 2006, Dr. Pursley specifically noted
that Plaintiff's angina was not severe, and that his symptoms
were relieved with Nitroglycerin.  Dr. Pursley also noted that
Plaintiff was not suffering from nausea or vomiting.  (Doc. 28,
Ex. B at 3).

     As discussed above, in order to satisfy the subjective
element of an Eighth Amendment claim, Plaintiff must show that
Defendant knew of and disregarded "an excessive risk to [his]
health or safety."  Farrow, 320 F.3d at 1245.   Stated
differently, Plaintiff must show that Defendants had "subjective
knowledge of a risk of serious harm," that Defendants disregarded
that risk, and that Defendants did so "by conduct that is more
than mere negligence."  Id.

     The record here, however, is devoid of evidence that
Defendants had subjective knowledge of, and disregarded, a risk
of serious harm to Plaintiff from his heart problems.  To the
contrary, the record shows that Dr. Barnes and Nurse Gordon were
concerned about Plaintiff's heart problems and that they were
constantly monitoring and treating Plaintiff with special
medications, as well as pain medications, specialist evaluations,
and diagnostic procedures from the date of his transfer to
Fountain in December of 2004 until the present.  There is no
evidence that Defendants were deliberately indifferent to the
pain that Plaintiff was suffering or even that Dr. Barnes and

Nurse Gordon ever stopped trying to improve Plaintiff's condition.

The Eleventh Circuit has recognized that "when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." <u>Waldrop v. Evans</u>, 871 F.2d 1030, 1035 (11th Cir. 1989). The fact that a Plaintiff may disagree with the efficacy of the treatment recommended or simply prefer a different course of treatment does not state a valid claim of medical mistreatment under the Eighth Amendment. <u>See</u>, <u>e.g.</u>, <u>Adams v. Poag</u>, 61 F.3d 1537, 1545 (11th Cir. 1995) ("the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment.") (quoting <u>Estelle</u>, 429 U.S. at 107); <u>Del Muro v. Federal Bureau of Prisons</u>, 2004 WL 1542216, *4 (N.D. Tex. 2004) ("[i]t is well-established that a difference in opinion or a disagreement between an inmate and prison officials as to what medical care is appropriate for his particular condition does not state a claim for deliberate indifference to medical needs.").

Despite the fact that Plaintiff may disagree with his particular course of treatment or particular medications, there is no evidence of a constitutional violation. At best, Plaintiff may have stated a claim of negligence, or even medical

25

malpractice, but certainly not the deliberate indifference that
is mandatory to assert a valid constitutional claim.  It is well
established that "[s]imple medical malpractice . . . does not
rise to the level of a constitutional violation."  Waldrop, 871
F.2d at 1035.  Thus, even if the Court were to assume that
Plaintiff had been incorrectly or negligently treated by Dr.
Barnes and Nurse Gordon, of which there is no evidence, Eighth
Amendment liability cannot be grounded on "mere negligence."
Farrow, 320 F.3d at 1245.  While the Court recognizes that
Plaintiff experienced heart problems and chest pain
intermittently since his arrival at Fountain in December 2004,
there is no evidence that Dr. Barnes or Nurse Gordon ever refused
to treat him or that they engaged in "deliberately indifferent"
delay in treating his pain or heart condition.  Cf., McElligott
v. Foley, 182 F.3d 1248, 1257 (11th Cir. 1999) (reversing summary
judgment for a prison physician and nurse who failed to provide
pain medication, other than Tylenol, for an inmate suffering
severe abdominal pain from stomach cancer).

     Inasmuch as Plaintiff's own medical records establish that
he received extensive medical treatment for his health problems,
including his heart condition and chest pain, Plaintiff has
failed to meet the subjective element of "deliberate
indifference" necessary to constitute an Eighth Amendment
violation.  Thus, having considered the evidence in the light

most favorable to Plaintiff, the Court has determined that there has been no constitutional violation, and Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim of inadequate medical care.

## V.   CONCLUSION

Based on the foregoing, it is recommended that the Motion for Summary Judgment of Defendants Prison Health Services, Inc., Dr. Robert Barnes, and Julia Gordon (Docs. 26, 28, and 35), be granted and that Plaintiff's action against Defendants be dismissed with prejudice.

MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1.   Objection.   Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court. Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.   See 28 U.S.C. § 636(b)(1)(C); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988); Nettles v. Wainwright, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*).   The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.   The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection. The objecting party shall submit to the district judge, at the

27

time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made. It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection. Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.  Transcript (applicable where proceedings tape recorded). Pursuant to 28 U.S.C. § 1915 and Fed. R. Civ. P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

DONE this 17th day of December, 2007.

s/BERT W. MILLING, JR.
UNITED STATES MAGISTRATE JUDGE

28